In the case against Hansford Parker, the opinion of the Court was delivered by
Wardlaw, J.
What is called the record of a bill in Equity, is at best an incomplete proceeding, which was interrupted after some interlocutory orders but before any final decree. Certain steps were taken by a solicitor for the complainants, but there was no service of process upon the defendants, nor judgment against them, nor evidence of their participation in the matter, or assent to it. The proceedings, then, can have no effect against any body as a judgment: but the papers which contain them may be evidence of their own existence and of the consequences which thence result: and the acts which they exhibit may avail, as declarations would do, to bind those who did them. It may be presumed that the complainants’s solicitor had the warrant of complainants: it would follow then, at most, that William Lyman and Sarah Twining, the complainants, and those claiming under them, are bound by his acts, and that the proceedings are evidence that these complainants did file the bill in Equity, and after certain orders did abandon their proceeding. Whatever may be deduced from these facts might be urged against William Lyman and Sarah Twining : but the plaintiffs here do not claim under them, and cannot be affected by any deduction drawn from their acts.
It is even more clear that the plaintiffs are not bound by the statement of the will of Nathaniel Twining made in the bill in Equity or in an exhibit accompanying it: for the statements of a bill in Equity are, ordinarily, considered as the acts of coun *97 sel, and furnish only feeble evidence of admissions even against the complainants.
The entries in the Judge’s dockets, preceded by evidence of the loss of papers, may have been sufficient to shew that Nathaniel Twining did commence in the Court of Common Pleas a suit in partition against William Weekley and others, and that this suit was discontinued. Any inferences from these facts are binding on the plaintiffs who claim under Nathaniel Twining. Who were the others sued along with William Week-ley, of what land partition was sought, and why the suit was discontinued, are all matters about which no proper evidence has been given: for the testimony of Col Brown, Alexander Harden and John Connelly, (which gives vague impressions about things perhaps never well understood by the witnesses,) seems to relate not to a proceeding in partition, but to an action to try titles, and was not that secondary evidence of the contents of law papers, which would have been admissible after their existence and loss had been established.
We perceive, then, that testimony was received on the trial, which should have been excluded : but we cannot see how the result was thereby affected. If the admission of the copy will and of the probates written thereon, served, as it is said, to contradict Mrs. Joicey, by shewing that Nathaniel Twining died in 1817, and not in 1818 as she testified, the case of the plaintiffs is in no way injured by the contradiction. If Nathaniel Twining brought a suit in partition, no letting fall of such suit could bar him, as the letting fall of an action of ejectment without bringing a second action might have done; and so the jury were instructed. If admissions of these plaintiffs were argued from the acts of the complainants in the bill in Equity, such admissions affected only the question of title, and were wholly irrelevant to the only question which was submitted to the jury,, when they were told the plaintiffs had shewn a good title, and that they must enquire whether Jesse Connolly and Joseph Connolly had an adverse possession for seven years or more before the death of Nathaniel Twining. The jury have found *98 that Nathaniel Twining, in his lifetime, was barred by adverse possession; and of this the report shows that the evidence was ample.
We cannot presume that the jury were influenced by irrelevant testimony or misled by illogical inferences, when their verdict is well supported by competent evidence. The improper admission of incompetent testimony, which does not bear upon the questions of fact really in controversy, has often less influ ence upon the jury than the sly introduction oí irrelevant topics, or the unfair use of circumstances contained in the evidence, both of which often occur in the argument of cases. But these latter improprieties could not usually be made reasons for granting a new trial, without serious delay of justice; and as to the former, this Court must endeavor to exercise a sound discretion, and not to be led by an arbitrary rule to ascribe importance to that which it sees was wholly unimportant.
The motion is, therefore, dismissed.
O’Neall, Evans, Withers and Whitner, JJ. concurred.
Frost, J. concurred in the result.
In the cases against Madison Rooks and others, the opinion of the Court was also delivered by
Wardlaw, J.
In the case of Hill vs. Sanders (4 Rich. 526,) decided at the last term, it was held, in reference to the admission of tbe same copy deed which is now in question, that the county court of Winton not having been organized when the deed was registered, and no district Registry of Mesne Conveyances for Orangeburg appearing then to have been in existence, the deed was properly registered in the oflice of the Register of Mesne Conveyances at Charleston : and so the copy from that office was admissible. The case now before us is supposed to have been made different from Hill vs. Sanders, by the introduction of two old books, which have been found in the Clerk’s office for Orangeburg district, and are thought to shew that there was, at the time when the deed was registered in Charles *99 ton, a Registry of Mesne Conveyances existing in Orangeburg district.
These old books have been laid before this Court, and we have carefully examined them and noticed the testimony of Mr. Glover, the clerk, who produced them. The books, in the report, are said to be “ two unbound books, purporting to be a registry book of Mesne Conveyances for that (Orangeburg) district.”. They manifestly contain copies of deeds which are therein recorded, as is said therein ; but no where do they purport to have belonged to a district registry as distinguished from a county registry. Whether they belonged to the registry which was kept by the county court for Orange county, or io one which was kept by a Register of Mesne Conveyances for Orangeburg district, they are now, under various Acts of the Legislature, (7 Stat. 269; 296; 298) properly kept by the Clerk of the Court of Common Pleas for the district of Orangeburg, and Mr. Glover, the clerk, would be in the course of his duty in certifying copies from them. But that does not help us in the question which is to be resolved concerning them, — for if they belonged to the registry for the county of Orange, they furnish no evidence of the existence of a district registry, and their introduction serves no purpose.
The second one of them contains no date shewing any registry made prior to April, 1787, — it plainly is altogether the work of the Clerk of the County Court for Orange. The first one only is then material, and the only entry in that, which leads to the supposition that it was the act of a district Register and not of the county Clerk, is the entry on page 214, in these words,— “ Recorded 4 June, 1785.” The argument is this: The County Court for Orange was not organized until April, 1786 ; the first entry in the minutes of the County Court, dated April, 1786, shews that the clerk and sheriff were then appointed by the Judges : recording done in June, 1785, could not then have been done by the Clerk of the county; and as the Constitution of 1778 provides in sec. 29, that, amongst other officers, “ the Register of Mesne Conveyances in each district,” shall be chosen by *100 the Senate and House of Representatives, and in sec. 31, that in case of vacancy in any of the offices directed to be filled by the Senate and House of Representatives, the Governor and Council “ may appoint others in their stead,” it is to be presumed that a Register for Orangeburg district was either chosen or appointed between 1778 and 1785, and continued to discharge his duties, from his entry into office until he was entirely superseded by the organization of the County Court in every one of the four counties into which, by the Acts of March 1785, (4 Stat. 664; 7 Stat. 212) Orangeburg district was divided.
To understand the force of the entry made in the old book at page 214, upon which all this argument depends, we must observe that, first: — In the old book, the numbering of its pages begins with 176, blank, leaves are left, the first writing is on page 200, — the whole book is made up of sheets loosely stitched together, and additions to its original size seem to have been made, and could easily -be made either at the beginning or the end.
Second : James Carmichael was Clerk of the Court of Common Pleas for Orangeburg district, when the County Court Act was passed in March 1785, and continued in that office until 1790, and afterwards ; and he was also appointed by the Judges of the County Court for Orange, clerk of that County Court:— Third: The old books now spoken of, were manifestly the books of registry, in which James Carmichael, as Clerk of the County Court, did register deeds, whether the first book was begun by him or not.
Fourth: After, by Act passed 19th February, 1791, (7 Stat. 269) the County Court of Orange was suspended, and the County registry of deeds was transferred to the district Register, a new book was begun by the district Register, (Bruce, who was elected the day before the ratification of this last mentioned Act,) and a regular series of books has since been continued.
These observations, apart from all other evidence concerning the existence of a Register for Orangeburg district in 1785, seem naturally to conduct to the conclusion that the writing in the *101 old book, from its beginning at page 200 to page 214, although not in the handwriting of Carmichael, was done by his authority, as Clerk of the County Court, and was probably all intended to be embraced by the entry, Recorded June 4, 1785. The date of that entry, we think, may be explained by one or both of two suppositions; first, that the majority of the Judges of the County Court had, in fact, between March, 1785, and June, 1785, appointed Carmichael to be Clerk of the County Court, although the court was not fully organized, nor a minute of its proceedings kept, before April, 1786; and, second, that even if the recording was done after the organization of the County Court, date was given to it, according to the day when the deeds were left with Carmichael, then clerk of the district Court, and either-appointed, or expected to be appointed, clerk of the County Court. The blank leaves left and the provision made for prefixing more in the old book, seem to shew that he who made these contrivances did not intend to write regularly onward in the book, but for some reason designed to give precedence, in the order of entering, to some deeds over others; and a circumstance, which an examination of the old book has disclosed, gives additional probability to one or both of the suppositions we have made. That is this, — all the deeds recorded between pages 200 and 214, relate entirely to personal property, except, perhaps, one, which seems to cover all the grantor’s property in Camden. The 45th sec. of the County Court Act, (7 Stat. 232) may well have been construed to mean, that all deeds should be recorded in the Clerk’s office of the County Court, but that the mode of proving deeds in open court therein provided, was required only as to conveyances of real estate, (see also 7 Stat. 234, 1785, § 47; 244, 1786, § 10; 247, 1788, § 1). Before the County Court met, a county clerk, if appointed, might have considered it proper to record deeds of personalty; but he could not, without plainly violating the letter of his instructions, have admitted to record any conveyance of real estate. We accordingly find that, on the next page after the entry dated June, 1785, a deed of real estate is recorded ; and in Carmichael’s *102 handwriting, on page 216, it is said to have been “recorded 28th March, 1787.” The recording of deeds of personalty was no where, perhaps, (except in Georgetown, 5 Stat. 187) within the duty of a Register of Mesne conveyances, as the duties of that office were defined by the Acts of 1698 and 1731, and were afterwards understood, prior to late Acts concerning the recording of marriage settlements and mortgages. A very faint presumption that one was doing the duty of such Register, could then arise from his having, in 1785, recorded deeds of personalty and no others. On the other hand, a registry embracing deeds of all kinds, is just such as the County Court Act contemplated should be kept by the clerk of the county court.
To the preceding, other considerations may be added, which oppugn the inference of an existing Register of Mesne Conveyances for Orangeburg district in 1785, that has been drawn from the old book we' have examined. No evidence has been adduced to shew that a Register for Orangeburg was ever either chosen by the Senate and House, of Representatives or appointed by the Governor and Council, before the election of Bruce in 1791. The Constitution of 1778, although it directs how a district Register shall be chosen, does not define the duties of that office, and seems to contemplate the intervention of the Governor and Council only for the appointment of officers instead of others who had been chosen and left vacancies. In 1786, (4 Stat. 722) an Act was passed, providing that Registers should be appointed for the districts of Georgetown and Beaufort, and should be vested with the like powers as were then exercised by the Register of Mesne Conveyances in Charleston. The terms of this Act confirm the conjecture, which the unsettled condition of the country during the Revolutionary war and soon afterwards, and all that we have heard concerning the officers that existed in the other districts into which the State was then divided, would, in view of the Constitution of 1778, of themselves have made probable, — that between 1778 and 1786, no Register was appointed out of Charleston. This Act made no provision for Orangeburg, nor for any district besides the two *103 that were named in it, because, in every district besides Charleston, Beaufort and Georgetown, county courts were in the course of organization, and the registers intended to be kept by the county clerks rendered a district register unnecessary. When, by Act of 19th February, 1791, (7 Stat. 269) county courts were suspended in Orangeburg, and the existence of a district Register was recognized, — a Register had been elected the day before the Act passed: becaúse, by this suspension, a district Register was made necessary, and the provisions made for Beaufort and Georgetown had sufficiently defined the duties of the district officer, the mode of whose appointment had been settled by the Constitution of 1778. Where county courts were established, the district Ordinaries, whose powers had been transferred to the county court Judges, were required to deliver all the records of their offices, to the Clerks of the Common Pleas in their several districts (7 Stat. 249): When county courts were suspended in Orangeburg district, and the offices of Register of Mesne Conveyances and Ordinary that had been superseded, were thereby again rendered necessary, provision was made for transferring the county court records, — those which related to the business of the Ordinary to the Ordinary — those which related to judicial business to the district clerk, and all other records to the Register of Mesne Conveyances (7 Stat. 249): — when clerks of the district courts were made ex officio Registers, they became ipso facto keepers of the records of the Register’s office in their districts respectively, (7 Stat. 296): — when county courts were abolished, the records of each county were transferred to the court of the district in which such county was included, (7 Stat. 298): — But no provision was made by the county court Act, or any other Act, for transferring to the county courts, or to any other office, the records of the district register, in any district where such Register, if existing, must have been superseded by the establishment of county courts. This is exactly consistent with the fact, as we believe it to have existed, that when county courts were established, there were no district Registers, besides the Register in Charleston: but in this state of the' legislation *104 on the subject, it would be very hard to explain how the records of a Register for Orangeburg district could have come to the keeping of a clerk of the county court for Orange (one of the four counties into which that district was divided) and should have been continued by him, without any caption, or even a black line to denote the change.
This Court, then, upon the evidence before it, attains the conclusion that there was no Registry of Mesne Conveyances for Orangeburg district, at the time the deed to Nathaniel Twining was recorded in the office of the Register of Mesne Conveyances at Charleston, to wit, the first day of September, 1786. In attaining this conclusion, we have avoided the question which has been raised, as to the admissibility of newly discovered documentary evidence which the appellants have offered for our consideration. We have noticed only the evidence which was offered on the circuit, and the public Acts of the Legislature, with the single addition of the fact that Bruce was elected Register for Orangeburg district on the 18th day of February, 1791. The fact of such an election having then taken place, serves only to explain the recognition of an existing Register which the Act passed in February, 1791, (7 Stat. 269) contains: and in default of proof, might well be inferred from the course of legislation which we have adverted to, and the appearance of the registry books soon afterwards begun.
The impossibility of Twining’s having his deed registered in the county court of Winton before that court was organized, forbids us, as is shewn in Hill vs. Sanders, from holding that the county court Act required that of him: but it is supposed that although he could not have obtained registry in the county where the land lies, the imperative provisions of the county court Act rendered registering any where else insufficient — that the impossibility may have exempted him from penalties for not registering in Winton, but did not authorize him to register in Charleston. In this view, there would have been, in strictness, no more authority for registering in the office of a Register for Orangeburg district, than in the office at Charleston. The gene *105 ral scheme of legislative provisions on the subject, however, gives no more countenance to this view than it received in Hill vs. Sanders. The Acts of 1698 (2 Stat. 137) and 1731 (3 Stat. 296) required registration of mesne conveyances for prevention of frauds, and gave advantage to him who was diligent in procuring it to be done in the single office which then existed in Charleston for the whole province. When the form of government, adopted by the Legislature in 1778, had provided for the manner in which a Register should be chosen for each of the judicial districts into which the State was then divided, the office in Charleston still subsisted; and it was until further provision made, the office for all districts wherein no separate Register was appointed, if, indeed, it would not, after mere appointment for other districts should have been made, still have continued, at the election of parties, an office for the whole State; for mere appointment, without any other provision, could hardly have had any other eifect than to create various offices of registry between which a choice might have been taken. The county court Act of 1785 intended to multiply places of registry, and to increase the stringency of previous regulations, particularly by requiring, as it for the first time did, that registration should be in the office of that territorial division within which the land lay. An amendment made in 1789, (5 Stat. 128) shews that, as to deeds not previously recorded, it was considered immaterial whether they should be afterwards registered in the Clerk’s office of the county, the Secretary’s office, or the office of Register of Mesne Conveyances for any district, where county courts were not established. By the county court Act it was designed that county courts should have been established in Charleston, as in every other part of the State, and after their complete organization the Register in Charleston, as other Registers (if others then existed) would have been, rendered unnecessary: — yet no provision was made for transferring the records of the registry in Charleston, and many subsequent provisions shew that the continued existence of the Charleston Register was conformable to the views of the Legislature, and that the *106 cessation of his duties, before the substitute which county courts every where organized would have afforded, was not contemplated. The same expectation of continuance which prevailed as to the Charleston Register, would have prevailed as to any district Register that might have been appointed, until the substitute for him was ready to act. Before the organization of all the county courts in his district, such district Register would have continued to perform his duties, either as the exclusive register for those portions of his district which were as yet unprovided with other registers, or as one of two or more, to whom a party at his election might have resorted. Wherever no district Register had been appointed, and county courts had been established but not organized, it would have been proper to resort to the Register in Charleston, as if neither the Constitution of 1778, nor the county court Act had been passed ; for neither of them would as yet have made any change, and it would have been much more consistent with the wise purposes for which registration was designed, to hold that the existing officer was intended to go on in the performance of his duties until a contemplated substitute was ready to take his place, than to hold that a prospective improvement repealed useful provisions before better could be carried into effect.
Thus, it will be seen, that there is much more reason for saying that before the organization of the county court for Winton county, deeds of land lying in that county might have been registered in Charleston, even although there had been then existing a Register of Mesne Conveyances for Orangeburg district, than there is for saying that such deeds could not properly have been registered in Charleston, if no such Register for Orange-burg district had ever previously been appointed.
The motion to set aside the nonsuit is, therefore, granted.
O’Neall, Withers and Whitner, JJ. concurred.